IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| THOMAS SCIOSCIA, M.D. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 3:21cv814 |
| | ) |
| NEW YORK LIFE INSURANCE COMPANY, | ) |
| Serve: CT Corporation System | ) |
| (Registered Agent) | ) |
| 4701 Cox Road, Suite 285 | ) |
| Glen Allen, VA 23060 | ) |
| | ) |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, | ) |
| Serve: CT Corporation System | ) |
| (Registered Agent) | ) |
| 4701 Cox Road, Suite 285 | ) |
| Glen Allen, VA 23060 | ) |
| | ) |
| and | ) |
| | ) |
| ORTHOVIRGINIA, INC. INSURANCE PLAN | ) |
| Serve: Jamie Martin, Esq. | ) |
| (Registered Agent) | ) |
| Williams Mullen | ) |
| Williams Mullen Center | ) |
| 200 South 10th Street, Suite 1600 | ) |
| Richmond, VA 23219 | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Thomas Scioscia, M.D. ("Dr. Scioscia"), by counsel, states as follows as his Complaint against defendants New York Life Insurance Company ("New York Life"), Life Insurance Company of America ("LINA"), and the OrthoVirginia, Inc. Insurance Plan (the "Plan") (collectively "Defendants").

1

## NATURE OF ACTION

1. This is an action for ERISA[1] disability benefits. Unlike most such cases, however, it is a *not* a dispute whether Dr. Scioscia is disabled under the Plan. He is. Rather, it is a dispute about the *amount* of benefits Dr. Scioscia should be receiving. Under the Plan, a participant's monthly disability benefits are based on his salary right before his disability. Generally speaking, the higher the salary, the higher the monthly benefit. Here, even though Dr. Scioscia made $844,721.72 right before his disability, New York Life[2] said he made just $120,000. This low calculation not only gave Dr. Scioscia a lower monthly benefit amount than he should have had, it also further reduced his benefit based on his post-disability earnings. Indeed, the overall net effect of New York Life's low salary calculation is that instead of receiving $8,000 a month, Dr. Scioscia is only receiving $600, the minimum due under the Plan. New York Life's calculations are unreasonable, wrong, arbitrary, capricious, incorrect, and abuses of discretion. As such, Dr. Scioscia brings this lawsuit to enforce his rights under § 1132(a)(1)(B) of ERISA, to receive the correct amount of past and future benefits under the Plan; and (ii) to declare that New York Life failed to provide him with a "full and fair review," as required under ERISA.

---

[1] "ERISA" is the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.*

[2] LINA is the insurance company that insured the Plan, and CIGNA Corporation ("CIGNA"), LINA's then-parent company, served as the claims administrator during the review of Dr. Scioscia's claim. As explained herein, however, effective December 31, 2020, CIGNA sold its group life, accident, and disability insurance business to New York Life, making New York Life the successor-in-interest to both LINA and CIGNA regarding the current dispute. Thus, all references to the entity that handled and denied Dr. Scioscia's claim will be to "New York Life."

2

**JURISDICTION AND VENUE**

2. This Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

3. Venue is proper in this district and division pursuant to 29 U.S.C. § 1132(e)(2), 28 U.S.C. § 1391, and Local Rule 3(B)(4), as this is the district and division where a substantial part of the events or omissions giving rise to the claims herein occurred.

**PARTIES**

4. Dr. Scioscia is an individual resident of Midlothian, Virginia. At all relevant times herein, he is, was, and has been, a participant in the Plan, as defined under § 1002(7) of ERISA, through his status as a former full-time active employee of OrthoVirginia, Inc. ("OrthoVirginia").

5. The Plan, sponsored by OrthoVirginia, is an employee welfare benefit plan as defined under § 1002(1) of ERISA and is governed by ERISA. At all relevant times herein, OrthoVirginia, is, was, and has been the plan administrator, as that term is defined under § 1002(16) of ERISA, for the Plan.

6. The Plan is funded through a group long-term disability insurance policy issued by LINA. The policy is identified as Policy No.: LK-0965516 and serves as the sole source of the LTD benefits at issue in this case.

7. The Plan designates LINA as the claims administrator and the claims fiduciary -- as that term is defined under § 1002(21) of ERISA -- for the Plan. For this claim, LINA processed Dr. Scioscia's initial claim for benefits and also retained final

decision-making authority when it came to denying his appeal regarding the amount of the monthly benefit. In its capacity as claims fiduciary, LINA made, or was otherwise legally responsible for, all of the decisions at issue in this suit.

8. Effective December 31, 2020, New York Life purchased the group life, accident, and disability insurance business from CIGNA, LINA's parent company. This purchase included the acquisition of all liability for Dr. Scioscia's benefit claim in this case. As such, New York Life has now become LINA's successor-in-interest to the claim and is responsible not only for all of LINA's decisions at issue in this case but also for the benefits owed in this case.

## FACTS

**A. DR. SCIOSCIA'S EMPLOYMENT AT ORTHOVIRGINIA AND HIS ANNUAL SALARY AS AN ORTHOPEDIC SURGEON.**

9. At all relevant times until he became disabled, Dr. Scioscia was a full-time active employee at OrthoVirginia. Through such status, Scioscia was eligible for, and did receive, various types of employment benefits, including disability insurance coverage, which was provided by LINA.

10. Also at all relevant times until he became disabled, Dr. Scioscia was a well-compensated orthopedic surgeon at OrthoVirginia. Indeed, in the year just prior to his disability, Dr. Scioscia earned a salary of $844,721.72.

11. As a physician employee of OrthoVirginia, Dr. Scioscia's annual salary was paid according to a two-part compensation formula.

12. The first part of the formula was a guaranteed annualized "Base Draw" of $120,000, which was paid out to Dr. Scioscia at $10,000 per month under the terms

of his OrthoVirginia employment contract.

13. The second part of the formula were quarterly "true-up" payments. These payments captured the true value of Dr. Scioscia's work at Ortho-Virginia and were calculated by taking the difference from his "Total Receipts" and his "Expenses," which included his "Base Draw," for the relevant quarterly time period. These "true-up" payments were paid to Dr. Scioscia as income in exactly the same manner as his "Base Draw" monthly payments.

14. The combination of Dr. Scioscia's "Base Draw" payments and his "true-up" payments constituted his annual salary at OrthoVirginia.

**B.  DR. SCIOSCIA'S 2020 DISABILITY AND HOW HIS MONTHLY BENEFITS _SHOULD HAVE BEEN_ CALCULATED UNDER THE PLAN.**

15. On or about January 8, 2020, Dr. Scioscia became disabled from working as an orthopedic surgeon.

16. As a result of his disability, Dr. Scioscia, after a short waiting period, _should have_ been receiving monthly benefits in the amount of $8,000, the maximum amount available under the Plan.

17. Specifically, the Plan says that a participant's monthly benefit amount is his "Gross Disability Benefit." This amount is defined as "[t]he _lesser_ of 60% of your monthly Covered Earnings rounded to the nearest dollar _or_ your Maximum Disability Benefit [of $8,000]." (emphasis added). In other words, if sixty (60) percent of a participant's "Covered Earnings" is higher than $8,000, then his monthly benefit amount is $8,000.

5

18. "Covered Earnings" are defined as an employee's "wage or *salary* as reported by the Employer *for work performed* for the Employer as *in effect just prior* to the date your Disability begins." (emphasis added). These earnings do not include payments for bonuses, commissions, overtime pay, or "other *extra* compensation." (emphasis added).

19. Here, 60% of Dr. Scioscia's "Covered Earnings" was greater than $8,000. As already noted, Dr. Scioscia's annual salary "just prior" to his Disability was $844,721.72. Then, when that number is divided by 12 (for a per month calculation), it becomes $70,333. And, finally, when you take sixty percent of that number, you get roughly $42,000, which is greater than $8,000,

20. Simply stated, using Dr. Scioscia's 2019 annual salary of $844,721.72 as his "Covered Earnings," his "Gross Disability Benefit" amount is $8,000.

C. **HOW NEW YORK LIFE IMPROPERLY CALCULATED DR. SCIOSCIA'S BENEFITS AND, THEN, HOW IT *FURTHER* IMPROPERLY REDUCED THEM.**

21. New York Life, however, refused to use Dr. Scioscia's 2019 annual salary of $844,721.72 as his "Covered Earnings." Instead, it used only his annualized "Base Draw" of $120,000, which then (as divided by 12) translated into a monthly "Covered Earnings" amount of only $10,000.

22. As for Dr. Scioscia's "Gross Disability Benefit," New York Life calculated it at $6,000, or 60% of $10,000. *Unlike* the high 60% figure that results from using $844,721.72 as Dr. Scioscia's "Covered Earnings," New York Life's 60% figure -- i.e., the one that you get when you simply use Dr. Scioscia's $120,000 "Base Draw" -- is *less* than the Plan's $8,000 maximum benefit amount.

6

23. New York Life then made matters worse.

24. In addition to its disability provisions, the Plan contains a "Return to Work Incentive" provision. This provision applies when an otherwise disabled person is, in fact, able to work in some capacity (e.g., in a job that is different than the one from which he is disabled under the terms of the Plan) and obtain earnings during his time of disability.

25. Under this provision, a participant's disability benefits *can* be reduced due to his post-disability earnings. But a reduction is not automatically required simply because a disabled participant is now working in a new position. Instead, the Plan requires a reduction *only* when the participant's new earnings are so high that they are comparable to his pre-Disability salary.

26. The controlling issue is how high the participant's "Indexed Earnings" -- which, under the relevant Plan terms, equal the participant's "Covered Earnings" – are. If a participant's "Indexed Earnings," for example, are extremely high as compared to his post-Disability earnings, it is not likely that his disability benefits will be reduced. On the other hand, if a participant's "Indexed Earnings" are similar to, or only slightly higher than, his post-Disability earnings, then his benefits likely *will be* reduced.

27. Here, despite being disabled from working as an orthopedic surgeon, Dr. Scioscia has since become employed as a Medical Director at an insurance company. *Unlike* at his prior position at OrthoVirginia, in his current job, Dr. Scioscia does *not* perform surgeries or otherwise engage in duties that are similar to those from his

7

prior medical specialty. Indeed, his duties are substantially reduced in comparison to his duties as an orthopedic surgeon at OrthoVirginia. Correspondingly, Dr. Scioscia's salary at his new job is substantially lower than his previous salary at OrthoVirginia and is only $185,000.

28. When comparing Dr. Scioscia's $844,721.72 pre-disability salary with his $185,000 post-disability salary, the Plan's "Return to Work Incentive" provision should have had ***no impact*** on the amount of his monthly benefits under the Plan. This is because Dr. Scioscia's "Indexed Earnings" – i.e., the same amount as his "Covered Earnings" -- are $844,721.72 and, thus, are too high to be affected by his substantially lower post-disability salary.

29. New York Life, however, again used Dr. Scioscia's $120,000 "Base Draw" as his "Covered Earnings" for purposes of applying the "Return to Work Incentive" provision. This, in turn, meant that his "Indexed Earnings" were also just $120,000. Then, applying this improper lower salary number to the "Return to Work Incentive" formula, Dr. Scioscia's new post-disability earnings wiped out his monthly benefit amount completely. As such, he now only receives $600 a month, which is the bare minimum benefit amount due under the Plan.[3]

**D.    THE ADMINISTRATIVE PROCESS.**

30. After Dr. Scioscia filed his claim for disability benefits, New York Life approved him for such benefits at $6,000 a month. This benefit number was based on

---

[3] Under the Plan, this minimum amount is required to be paid to Dr. Scioscia regardless of whether he receives any post-disability earnings.

New York Life's claim that Dr. Scioscia's $120,000 "Base Draw" was all that counted as his "Covered Earnings" and that all of his salary above that "base" amount were bonuses because the word "bonus" appeared on his pay stubs.

31. New York Life also applied the low "base" number to the Plan's "Return to Work Incentive" and reduced Dr. Scioscia's benefit amount to $600 a month.

32. Dr. Scioscia immediately appealed New York Life's "Covered Earnings" calculations and explained that his "true up" payments were not bonuses but were actually part of his salary. He also put New York Life in touch with the CFO of OrthoVirginia, who e-mailed New York Life and told it:

> The designation of "bonus" is an internal term and is not representative of the nature of the payment. Our physicians are paid an annual draw of $125k (***no orthopedic surgeon would work for a salary of $125k***).[4] Quarterly we true up compensation earned based on the work done.
>
> His W-2 earnings represent what he earned as a physician at OrthoVirginia. No "bonus" was paid.

(emphasis added).

33. Despite OrthoVirginia's clear explanation regarding the true nature of Dr. Scioscia's quarterly "true up" payments, New York Life denied Dr. Scioscia's appeal regarding the calculation of his "Covered Earnings" under the Plan.

34. But, in doing so, it switched gears. Rather than basing its calculation decision, as it had initially, on the "bonus" language from the Plan's definition of "Covered Earnings," it changed course and said that the "true-up" payments – even

---

[4] The reference to "$125k" was the base pay amount for 2020 employees, not 2019 employees. For 2019, Dr. Scioscia's base pay was $120,000.

9

if not "bonuses" – were still not included in Dr. Scioscia's "Covered Earnings" because they were "other extra compensation" under the Plan's definition.

35. New York Life gave Dr. Scioscia no further opportunities to challenge this new basis for denying his claim and, instead, told him "[a]t this point in time you have exhausted all administrative levels of appeal and ***no further appeals will be considered***." (emphasis added).

36. If New York Life *had*, in fact, given Dr. Scioscia further appeal rights, it would have learned that its position as to "other ***extra*** compensation" was wrong, both as a matter of fact and as a matter of policy interpretation.

37. First of all, as a purely factual matter, Dr. Scioscia's quarterly "true up" payments were not "extra" compensation. To the contrary, they were part of his regular compensation that was expressly set forth in his employment agreement. They were payments for his regular work performed, not anything extra.

38. Second, categorizing Dr. Scioscia's "true up" payments as "other extra compensation" is incompatible with the Plan's use of the word "extra" in its definition of "Covered Earnings." According to its plain, unambiguous, and generally accepted meaning, "extra" means "***more than*** is due, usual, or necessary" or "***beyond*** what is usual or standard." (emphasis added)[5]  No part of Dr. Scioscia's quarterly true-up payments, however, were "more than" what he was due.  Nor were they beyond what were his usual and standard compensation payments. Again, they were simply payments made for the performance of his regular work.

---

[5] https://www.merriam-webster.com/dictionary/extra (viewed on December 28, 2021).

10

39. In the face of New York Life's denial decisions, this lawsuit has followed.

40. This ERISA litigation is appropriate because to the extent applicable, Dr. Scioscia has exhausted all of his administrative remedies related to his claim.

41. This litigation also is timely filed within the applicable statutes of limitations.

## COUNT I:
### ENFORCE AND CLARIFY RIGHT TO BENEFITS (29 U.S.C. § 1132(a)(1)(B))

42. The allegations of paragraphs 1-41 are realleged as if fully set forth herein.

43. As is clear from the allegations stated herein, Dr. Scioscia made a timely, proper, and meritorious claim for the *correct* amount of monthly disability benefits under the Plan.

44. Despite the meritorious nature of Dr. Scioscia's position as to what should be included in his "Covered Earnings" under the Plan (and his related position as to the calculation of his "Indexed Earnings"), New York Life has refused to properly calculate his monthly disability benefits.

45. New York Life's calculation decisions should be overturned because they are wrong, incorrect, improper, unreasonable, unlawful, abuses of discretion, arbitrary and capricious, and otherwise violative of ERISA. Most notably, New York Life's calculations are (i) factually inaccurate, and thus are not based on substantial evidence, because Dr. Scioscia's quarterly true-up payments from OrthoVirginia are neither "bonuses" nor "other extra compensation" as those terms are used in the Plan; and (ii) unreasonable because they are inconsistent with the plain, unambiguous and

11

well-accepted meaning of the word "extra" as it is used in the Plan's definitions of "Covered Earnings" and "Indexed Earnings."

46. The unreasonableness of New York Life's calculation decisions also are shown by the fact that it labors under a financial conflict of interest vis-à-vis the benefits to be paid to Dr. Scioscia. Specifically, where an entity, such as LINA here, both administers and insures a plan, its profits (or losses) depend in part on how the actual cost of providing coverage diverges from the projections on which it based premiums. Thus, over time, a predilection to deny coverage pays well, even for relatively inexpensive benefits. Under ERISA, such a conflict must be weighed as a factor in determining whether New York Life's calculation decisions were reasonable and/or correct. And here, such conflict weighs *against* the reasonableness of New York Life's calculation decisions.

47. The Court also should award Dr. Scioscia his attorney's fees and all other appropriate relief under ERISA, as requested below, for having to litigate this particular issue in this lawsuit.

48. The administrative process applicable to Dr. Scioscia's claim has been exhausted and his claim is ripe for judicial review in this Court.

### COUNT II:
### REQUEST FOR FULL AND FAIR REVIEW UNDER ERISA
### (REQUEST FOR REMAND – IN THE ALTERNATIVE)

49. The allegations of paragraphs 1-48 are realleged as if fully set forth herein.

12

50. For purposes of this Count, Dr. Scioscia requests that the Court hold that New York Life's calculations as to his disability benefits were wrong, incorrect, improper, unlawful, unreasonable, abuses of discretion, arbitrary and capricious, and otherwise violative of ERISA.

51. For purposes of this Count, in the event the Court cannot conclude based on the present administrative record that Dr. Scioscia is entitled to have his benefits calculated in the manner he seeks herein, especially since New York Life ambushed him by providing a new basis for denying his benefit calculations *for the first time in its appeal denial letter*, then he requests, as an alternative remedy, that the Court remand the claim back New York Life for further review consistent with the full and fair review requirements of ERISA.

52. The Court should also award Dr. Scioscia his attorney's fees and all other appropriate relief under ERISA, as requested below, for having to litigate this particular issue in this lawsuit.

53. The administrative process applicable to Scioscia's claim has been exhausted and her claim is ripe for judicial review in this Court.

WHEREFORE, Plaintiff requests this Honorable Court to order, adjudge, declare and decree that:

(a) The calculation of Dr. Scioscia's monthly disability benefits – specifically its calculation of his "Covered Earnings" and his "Indexed Earnings" under the terms of the Plan – are incorrect, wrong, unreasonable, arbitrary, capricious and abuses of

discretion and should be remedied so that they include the amounts of Dr. Scioscia's quarterly true-up payments from 2019;

    (b)    Dr. Scioscia is entitled to be paid the difference between the correct amount of benefits he should have been receiving and the low benefits he previously received regarding his past benefits and is entitled to be paid all future benefits with the correct calculations under the Plan;

    (c)    Alternatively, Dr. Scioscia's claim for benefits should be remanded to New York Life for further review consistent with the "full and fair review" requirements of ERISA;

    (d)    Dr. Scioscia be awarded pre-judgment interest;

    (e)    Dr. Scioscia be awarded post-judgment interest;

    (f)    Dr. Scioscia be awarded costs;

    (g)    Dr. Scioscia be awarded attorney's fees associated with this lawsuit; and

    (h)    Dr. Scioscia be awarded all such other further and appropriate equitable relief.

    Respectfully submitted,

    THOMAS SCIOSCIA

    By:    /s/Richard F. Hawkins, III
    Richard F. Hawkins, III, VSB# 40666
    THE HAWKINS LAW FIRM, PC
    2222 Monument Avenue
    Richmond, Virginia 232220
    (804) 308-3040 (telephone)
    (804) 308-3132 (facsimile)
    Email: rhawkins@thehawkinslawfirm.net

    Counsel for Plaintiff